# UNITED STATES v. NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED 'STATES FOR THE MIDDLE DISTRICT OF TENNESSEE.

Argued April 15, 1886.—Decided April 26, 1886.

The statute of limitations of a State does not run against the right of action of the United States upon negotiable bonds and coupons of a railroad corporation, purchased by the United States before maturity as an investment of money received from the sale of lands ceded by an Indian tribe, and held in trust for the tribe, under a treaty.

This action was brought July 6, 1880, in the Circuit Court of the United States for the Middle District of Tennessee upon coupons, owned and held by the United States, for interest payable at different dates from July 1, 1861, to January 1, 1866, on bonds made and delivered by the defendant to the State of Tennessee on July 1, 1851, and July 1, 1852, and payable to bearer in thirty years after date.

The defendant filed two pleas: First. That the United States held the coupons, not in its own right as the Government of the United States, but as trustee for certain beneficiaries, namely, the Chickasaw Indians, a nation of people, and that the cause of action accrued to the United States more than six years before this suit was brought. Second, That the United States was the holder of the coupons, not in its own right, but as such trustee, from January 10, 1866, until January 20, 1878, at which last date it ceased to hold them as trustee, and became the owner thereof in its own right; and that the cause of action accrued more than six years before that date.

To each of these pleas the United States filed a demurrer, which was overruled by the court, and issue was joined on the pleas.

By the treaty of October 20, 1832, between the United States and the Chickasaw Nation of Indians, which provided for the removal of the Chickasaws to the west of the Mississippi, they

ceded to the United States all their lands east of the Mississippi; and the United States agreed that those lands should be surveyed and sold, like other public lands, and the proceeds, deducting expenses, paid over to the Chickasaw Nation. The eleventh article of that treaty contains the following provisions:

"The Chickasaw Nation have determined to create a perpetual fund, for the use of the nation forever, out of the proceeds of the country now ceded away. And for that purpose they propose to invest a large proportion of the money arising from the sale of the land in some safe and valuable stocks, which will bring them in an annual interest or dividend, to be used for all national purposes, leaving the principal untouched, intending to use the interest alone. It is therefore proposed by the Chickasaws, and agreed to, that the sum to be laid out in stocks as above mentioned shall be left with the Government of the United States, until it can be laid out under the direction of the President of the United States, by and with the advice and consent of the Senate, in such safe and valuable stock as he may approve of, for the use and benefit of the Chickasaw Nation. The sum thus to be invested shall be equal to at least three fourths of the whole net proceeds of the sales of the lands; and as much more as the nation may determine, if there shall be a surplus after supplying all the national wants." "At the expiration of fifty years from this date, if the Chickasaw Nation shall have improved in education and civilization, and become so enlightened as to be capable of managing so large a sum of money to advantage, and with safety, for the benefit of the nation, and the President of the United States, with the Senate, shall be satisfied thereof, at that time, and shall give their consent thereto, the Chickasaw Nation may then withdraw the whole or any part of the fund now set apart to be laid out in stocks or at interest, and dispose of the same in any manner that they may think proper at that time, for the use and benefit of the whole nation; but no part of said fund shall ever be used for any other purpose than the benefit of the whole Chickasaw Nation." 7 Stat. 381, 382, 385.

In the treaty between the United States and the Chickasaw Indians of May 24, 1834, article 11, "it is stipulated that the Government of the United States, within six months after any public sale takes place, shall advise them of the receipts and expenditures, and of balances in their favor; and also, at regular intervals of six months after the first report is made, will afford them information of the proceeds of all entries and sales. The funds thence resulting, after the necessary expenses of surveying and selling and other advances which may be made are repaid to the United States, shall from time to time be invested in some secure stocks, redeemable within a period of not more than twenty years; and the United States will cause the interest arising therefrom annually to be paid to the Chickasaws." 7 Stat. 454.

By the treaty of June 22, 1852, article 2, "it is agreed that the remnant of the lands so ceded and yet unsold shall be disposed of as soon as practicable, under the direction of the President of the United States, in such manner and in such quantities as, in his judgment, shall be least expensive to the Chickasaws and most conducive to their benefit." The fifth article of this treaty is as follows:

" The Chickasaws are desirous that the whole amount of their national fund shall remain with the United States, in trust for the benefit of their people, and that the same shall on no account be diminished. It is, therefore, agreed that the United States shall continue to hold said fund, in trust as aforesaid, and shall constantly keep the same invested in safe and profitable stocks, the interest upon which shall be annually paid to the Chickasaw Nation: Provided, that so much of said fund, as the Chickasaws may require for the purpose of enabling them to effect the permanent settlement of their tribe as contemplated by the treaty of 1834, shall be subject to the control of their General Council." 10 Stat. 974, 975.

At the trial the following facts were proved and admitted: The bonds with the coupons annexed, mentioned in the declaration, were purchased in 1852 by the United States, acting as trustee for the Chickasaw Indians, under and pursuant to the treaties aforesaid, with the trust fund therein mentioned, and

were thenceforth held by the United States for the purposes of that trust until on or after July 20, 1878, when the United States, by virtue of the act of July 20, 1878, ch. 359, 20 Stat. 233, accounted with the Chickasaw Indians for the coupons sued on and interest thereon, and the United States have since claimed title to the same in their own right.   The bonds and coupons were at first in the care and custody of the Secretary of the Treasury under authority of law, and afterwards of the Secretary of the Interior under the act of July 27, 1868, ch. 248, 15 Stat. 222, until after June 10, 1876, when, pursuant to the act of June 10, 1876, ch. 122, 19 Stat. 58, they were turned over to the Treasurer of the United States, and have ever since been in his custody.   The coupons sued on were clipped from these bonds, and have never been paid.   The bonds, as well as the coupons payable at later dates, were paid by the defendant as they became payable.

Upon these facts, the Circuit Court instructed the jury that the plaintiff's right of action was barred by the statute of limitations of Tennessee, (Code of 1858, § 2775,) the jury returned a verdict for the defendant, and the plaintiff excepted to the instruction and sued out this writ of error.

*Mr. Assistant Attorney-General Maury* for plaintiff in error.

*Mr. Edward H. East* for defendant in error.

If the United States should buy or otherwise become the owner or holder of commercial or negotiable paper already barred by the statute of limitations, as between the original parties, its title being derivative, it would get no better right of action than the assignor could give, and it would take the paper subject to all legal defences existing at the time of the transfer. *United States* v. *Buford,* 3 Pet. 30; *Lambert* v. *Taylor,* 4 B. & C. 138; *S. C.* 10 Eng. C. L. 293. It is admitted that the United States' right of action cannot be barred by any statute of limitations passed by any State, though it be named therein. *United States* v. *Thompson,* 98 U. S. 486.

The distinction we make is this, that in all cases in which the United States brings an action in its own name, and solely in

its own interest, the maxim *nullum tempus* applies.  And in all cases in which it brings an action in its own name, nominally as trustee, and it is not the real and sole owner or beneficiary—then the maxim does not apply.  *Miller* v. *State*, 38 Ala. 600. The same rule prevails in the case of a mandamus to enforce a private right.  *Moody* v. *Fleming*, 4 Geo. 115.

The maxim *nullum tempus* does not apply in a case in which the sovereign or State has *some* pecuniary interest, and not the entire interest.   In illustration of this, we have the cases in which the United States or a State was a joint or sole owner of stock in a bank, and was either owner in part or the sole party in interest.  *Bank of United States* v. *McKenzie*, 2 Brock. 393 ; *Bank of Tennessee* v. *Dibrell*, 3 Sneed, 379.   But in this case the interest of the United States was only as trustee for the Chickasaw Indians.   They had no interest affecting the Sovereign power, and the maxim of *nullum tempus* only applies in favor of sovereign power.  *Cincinnati* v. *Evans*, 5 Ohio St. 594.   See also *United States* v. *Hoar*, 2 Mason, 311.

The statute of limitations is entitled to the same respect as any other statute, and should not be evaded or explained away. *Clementson* v. *Williams*, 8 Cranch, 72 ; *Roberts* v. *Pillow*, 8 Humph. 624 ; *Bell* v. *Morrison*, 1 Pet. 360 ; *Elder* v. *Bradley*, 2 Sneed, 247.

It cannot be said that the Indians were the *grantees* of the government in any such manner as to bring the case within the principles announced in England, extending the maxim to the grantees of the crown, as in *Doe* v. *Roberts*, 13 M. & W. 520, and *Lee* v. *Norris*, Cro. Eliz, 331.   The government did not own the lands, which constituted the consideration of the trust ; they belonged to the Indians.   It did not *grant* the bonds but bought them as trustee with the surplus funds of the Indians arising from the sale of the lands, and which remained after deducting expenses, and its relation to the fund was that of a pure and simple trustee, and no other.

When a trustee has the legal title and right of action, it is well settled that if the trustee is barred by the statute of limitations the *cestui que trust* is also barred, though an infant. *Wooldridge* v. *Planters' Bank*, 1 Sneed, 297 ; *Belote* v. *White*,

2 Head, 703 ; *Goss* v. *Singleton,* 2 Head, 67 ; *Williams* v. *Otey,* 8 Humph. 563.

The statute of limitations begins to run against coupons or interest warrants from the time they respectively mature, and this is so, especially, where they have been detached from the bond. *Amy* v. *Dubuque,* 98 U. S. 470 ; *Clark* v. *Iowa City,* 20 Wall. 583 ; *Warner* v. *Rising Fawn Iron Co.,* 3 Woods, 514 ; *Evertson* v. *Bank of Newport,* 66 N. Y. 14 ; *Cooper* v. *Thompson,* 13 Blatchford, 434 ; *House* v. *Tennessee Female College,* 7 Heiskell, 128 ; *Nashville* v. *First National Bank,* 1 Baxter, 402.

Mr. Justice Gray, after stating the case as above reported, delivered the opinion of the court.

It is settled beyond doubt or controversy—upon the foundation of the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided—that the United States, asserting rights vested in them as a sovereign government, are not bound by any statute of limitations, unless Congress has clearly manifested its intention that they should be so bound. *Lindsey* v. *Miller,* 6 Pet. 666 ; *United States* v. *Knight,* 14 Pet. 301, 315 ; *Gibson* v. *Chouteau,* 13 Wall. 92 ; *United States* v. *Thompson,* 98 U. S. 486 ; *Fink* v. *O'Neil,* 106 U. S. 272, 281.

The nature and legal effect of any contract, indeed, are not changed by its transfer to the United States. When the United States, through their lawfully authorized agents, become the owners of negotiable paper, they are obliged to give the same notice to charge an endorser as would be required of a private holder. *United States* v. *Barker,* 4 Wash. C. C. 464, and 12 Wheat. 559 ; *United States* v. *Bank of Metropolis,* 15 Pet. 377, 392, 393 ; *Cooke* v. *United States,* 91 U. S. 389, 396, 398. They take such paper subject to all the equities existing against the person from whom they purchase at the time when they acquire their title ; and cannot therefore maintain an action upon it, if at that time all right of action of that person was extinguished, or was barred by the statute of limitations. *United States* v. *Buford,* 3 Pet. 12, 30 ; *The King* v. *Morrall,* 6 Price, 24.

But if the bar of the statute is not complete when the United States become the owners and holders of the paper, it appears to us, notwithstanding the dictum of Cowen, J., in *United States* v. *White*, 2 Hill (N. Y.) 59, 61, impossible to hold that the statute could afterwards run against the United States. *Lambert* v. *Taylor*, 4 B. & C. 138; *S. C.*, 6 D. & R. 188.

In the present case, the United States bought the coupons sued on, and the bonds to which they were annexed, long before any of them became payable, or the statute of limitations had begun to run against the right of any holder to sue thereon. The money with which they were bought was money received by the United States from the sale of lands ceded to them by the Chickasaw Nation of Indians. Those lands, the money received from their sale, and the securities in which that money was invested, were held by the United States, in trust, to be applied for the benefit of those Indians, in performance of the obligation assumed by the United States by treaties with them. The securities were thus held by the United States for a public use in the highest sense, the performance of a *quasi* international obligation; and they continued to be so held until that obligation had been performed and discharged, after which they were held by the United States, like all other property of the government, for the ordinary public uses. *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 158.

The necessary conclusion is that the statute of limitations of Tennessee never ran against the right of action of the United States upon these coupons, either while the United States held them in trust for the Indians, or since they have held them for other public uses; and that the decision of the Circuit Court was erroneous.

This case does not present the question what effect the statute of limitations may have in an action on a contract in which the United States have nothing but the formal title, and the whole interest belongs to others. See *Maryland* v. *Baldwin*, 112 U. S. 490; *Miller* v. *State*, 38 Ala. 600.

> *Judgment reversed, and case remanded, with directions to set aside the verdict, and for further proceedings in conformity with law and with this opinion.*