Locust Street Subway Case.

Broad Street Subway Case (No. 1).

Eighth Street Subway Case.

Argued May 27, 1935. Before SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

162

*Howard E. Stern,* Assistant City Solicitor, with him *David J. Smyth,* City Solicitor, for appellant.

*Bertram G. Frazier,* with him *John W. Frazier, Jr.,* and *B. Graeme Frazier, Jr.,* for appellees.

OPINION BY MR. JUSTICE LINN, June 29, 1935:

The Act of June 17, 1913, P. L. 520, empowered the City of Philadelphia, inter alia, to construct transit facilities, a term defined in the act "to include railways . . . for the transportation of persons . . . under . . . streets . . . also . . . tunnels, [or] subways. . . ." The city by its contractors constructed the tunnels or subways involved in these appeals. Blasting during the construction is alleged to have caused damage to abutting property. The work in front of petitioners' properties was confined within the lines and below the surface of the city streets in public use for many years; no entry was made on petitioners' lands.

These appeals bring up three separate proceedings instituted by property owners at different points on the lines of the subways. A petition for a board of view was filed in Common Pleas No. 1 by the owner of certain property on South 8th Street; in Common Pleas No. 5, by the owner of property at the northeast corner of Broad and Master Streets; and in Common Pleas No. 2, by the owner of property on North 8th Street. Common Pleas Nos. 1 and 5 appointed boards of view; Common Pleas No. 2 dismissed the petition on the ground that there was no statute providing for viewers in such case. The two boards filed reports making awards of compensation. The city filed exceptions; when they were dismissed, appeals were taken to the Superior Court. From the refusal of Common Pleas No. 2 to appoint viewers, the petitioner appealed to the Superior Court. The three appeals were disposed of by affirming the action of courts Nos. 1 and 5 and reversing that of Common Pleas No. 2. Leave was then granted to the city to appeal to this court.

The abutting house owners contend that they sustained injury within article XVI, section 8, of the Constitution and that the appointment of viewers to assess damages was authorized by the Act of May 16, 1891, P. L. 75, section 1, amended June 12, 1893, P. L. 459; they also rely on three other statutes to be referred to.

The appellant city denies the contentions of the appellees and asserts that the boards of view were without jurisdiction of the claims.

Article XVI, section 8, provides: "Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed by the construction or enlargement of their works, highways or improvements, which compensation shall be paid or secured before such taking, injury or destruction. The General Assembly is hereby prohibited from depriving any person of an appeal from any preliminary assessment of damages against any such corporations or individuals made by viewers or otherwise; and the amount of such damages in all cases of appeal shall on the demand of either party be determined by a jury according to the course of the common law." The first part of the section created a new right, and required no legislation to make the right effective; it was enforceable by common law action on the case (Plan 166, 143 Pa. 414, 429; Shobert v. Bloomsburg, 74 Pa. Superior Ct. 246) since designated an action of trespass by the Act of May 25, 1887, P. L. 271. The second part of the section providing for an appeal was made effective by the Act of June 13, 1874, P. L. 283: Widening Chestnut Street, 128 Pa. 214, 216.

One petition averred that in constructing the subway it became necessary "to remove rock and other materials and obstacles in the path of the said tunnel by blasting the same with giant powder, dynamite and/or other powerful explosives under the supervision and with the knowledge and approval of the department of city transit of the City of Philadelphia"; that the "blasting was the necessary and approved means and method of accomplishing this part of the work"; that "As the immediate, unavoidable and necessary result of the . . . blasting . . . in front of, at, or near the said property of your petitioner, the land and building of which said property

consisted was made to sink, settle and subside, the building particularly being undermined, loosened, cracked, dislocated and injured." That the injury was the "direct, immediate, inevitable and necessary result of the work of excavating, tunnelling and blasting done and executed by the City of Philadelphia through the agency above named [the contractor]."[1]

The basic question is whether there is a remedy by the board of view procedure. As such remedy is not in the course of the common law, we look to the statutes to see whether it has been provided. The property owners say that it is given by the Act of May 16, 1891, P. L. 75, section 1, amended June 12, 1893, P. L. 459. They also refer to the Act of May 28, 1913, P. L. 368, containing substantially the same words; and to the Act of June 23, 1911, P. L. 1123 (amended 1929, P. L. 866), providing for the general appointment of viewers for specified terms of office, from which boards of view shall be appointed from time to time as may be authorized by law; and to the Transit Act of 1913, supra. Both Common Pleas No. 1 and No. 5 thought that the cases were within the Act of 1891, and that, in addition, the scope of the Transit Act of 1913 implied a remedy by viewers. We are constrained to differ from these interpretations of the statutes.

On May 16, 1891, the date of the approval of the act chiefly relied on, four acts were approved, three relating to the remedy by viewers and one concerning municipal liens, P. L. 65, 69, 71 and 75. In Howell v. Morrisville Boro., 212 Pa. 349, 354, 61 A. 932, MITCHELL, C. J., considered these four acts and the mischief intended to be remedied by them. Dealing with the act now relied on, he said: "It is in form and intent a general act, but it is

---

[1] In Stork v. Phila., 195 Pa. 101, 105, we said: "For such injury as is the direct and necessary consequence of the act itself of eminent domain, the liability of the city under the constitution is absolute, and no care or diligence will relieve it. But for damage resulting from the manner in which the act is done, the city is only liable by reason of negligence."

part of the series of curative acts [referring to the other three] on the subject and manifestly intended as a blanket supplement to the others, to supply deficiencies and confirm doubtful powers under existing legislation. . . . But its purpose was the protection of the interest of the cities, and there is neither express provision nor clear implication anywhere in the act of any intent to increase the obligations of the cities or enlarge the rights or claims of property holders. As to them, as said by our Brother DEAN in Daughters of American Revolution v. Schenley, 204 Pa. 572, already cited, the act adopted no new rule but merely accepted the law as it stood." In the Howell Case, viewers had been appointed to assess damages resulting from the vacation of part of a street in the Borough of Morrisville in Bucks County. On the trial of an appeal from the report of the viewers, the borough contended that there was no legislative provision for the recovery of damages resulting from the vacation of a street. The court below held that the Act of 1891, P. L. 75, so provided, since vacation of streets was included in its provisions. This was reversed; it was said that for injury resulting from the vacation of streets, there was no right of action because vacation is not a taking and that unless the legislature had provided it, as was done, for example, for the vacation of streets in the City of Philadelphia, there was no right to recover; that the Act of 1891 did not give such right to damages in cases where the right did not already exist, although providing procedure applicable to cases where present or future statutes gave such right.

Section 1 of the Act of 1891, P. L. 75, as amended 1893, P. L. 459, provides: "That all municipal corporations of this Commonwealth shall have power, whenever it shall be deemed necessary in the laying out, opening, widening, extending, grading or changing grade or lines of streets, lanes or alleys, the construction of bridges and the piers and abutments therefor, the construction of slopes, embankments and sewers, the changing of water

courses or vacation of streets or alleys, to take, use, occupy or injure private lands, property or material, and in case the compensation for the damages or the benefits accruing therefrom have not been agreed upon, any court of common pleas of the proper county, or any law judge thereof in vacation, on application thereto by petition by said municipal corporation or any person interested, shall appoint three discreet and disinterested freeholders as viewers. . . ."

The subway is a tube or tunnel constructed under the surface of the street without changing the grade of the street. The action of the city did not involve laying out or opening or widening of any street. The termini of the streets were not extended.[2] The grade of the streets was not changed; there was no alteration in the lines of the streets. No bridges, slopes, embankments or sewers were constructed. There was no change of watercourse or vacation of any street. This court has not held that the construction by a city of a tunnel or underground subway in the bed of an existing city street, is within the words of the statute.

It is suggested, in the opinion of the Superior Court, that the point was ruled in Stork v. Phila., supra, but we

---

[2] See Charlotte St., 23 Pa. 286; Mayor, etc., v. Ouachita Parish, 47 La. Ann. 1061, 17 S. 498; Matthiessen, etc., Co. v. Jersey City, 26 N. J. Eq. 247; Illinois Central R. R. Co. v. Chicago, 141 Ill. 586, 30 N. E. 1044. In Seattle, etc., Co. v. State, 7 Wash. 150, 157, 34 P. 551, it was said "the power is to *extend* or *project* streets, and by those two words we understand the legislature to have meant the same thing. They are common words, and when applied to an existing thing, like a street, they mean to construct it in the same direction, and with the same width." In Metlar v. Middlesex & S. Traction Co., 72 N. J. L. 524. 63 A. 497. the court said: "A man who says he has extended or intends to extend the boundaries of his yard, or the limits of his farm, may mean an expansion of the area of these properties in any direction; but when a man says he is going to extend his lane, or that his neighbors are going to extend a private road, or that the public authorities are going to extend a boulevard, no one would conceive for a moment that he meant that the lane, or road, or boulevard was to be merely widened."

do not so understand it; the question was not involved in that case. The Stork Case grew out of work done pursuant to a city ordinance passed March 17, 1894; Ordinances, 1894, page 52. Some idea of its scope can be obtained from its title: "To authorize the work necessary to abolish all grade crossings on Pennsylvania Avenue and Noble Street, between the east side of Thirteenth Street and Poplar Street, in the Fourteenth and Fifteenth Wards, by depressing the tracks and yards of the Philadelphia and Reading Railroad Company on Pennsylvania Avenue, between Broad Street and Thirtieth Street; providing for alterations in the lines and grades of its tracks and yards between the north side of Noble Street and Callowhill Street, and between Broad Street and Eleventh Street; and alterations in the lines and grades of the tracks of the Philadelphia and Reading Terminal Railroad Company east of Broad Street, between Noble Street and Carlton Street; to authorize the revision of lines and grades of streets, and otherwise provide for said constructions and all matters incident thereto; and providing for the carrying into effect such authority and certain conditions." It provided for changes in street lines, widening streets and changes of street grades in a large area of the city, and was therefore directly within the terms of the Act of 1891, P. L. 75, providing a remedy by viewers. In the section of that improvement nearest Fairmount Park, a subway or tunnel was constructed for the relocation of railway tracks theretofore laid on the surface. Farther east, the tracks were in an open cut. At the intersection of 18th Street and Pennsylvania Avenue (Stork's property fronted on 18th Street near the avenue), there was a change of grade of Pennsylvania Avenue resulting from its depression for the purpose of separating the existing grade crossing of 18th Street and the railway on the avenue. Property owners affected by this change in the surface grade of the avenue were of course directly within the change of grade provisions of the statute. But the decision is not authter-

ity for, and did not discuss, the proposition that the stat-
ute provided a remedy by viewers for damages resulting
from the construction of a subway or tunnel under the
surface of a street where there was no change of grade in
front of the abutter's property.

As the common law remedy for the injury made com-
pensable by article XVI, section 8, was by action on the
case, we are prohibited by a settled principle of the inter-
pretation of statutes from extending the meaning of the
words used by the legislature beyond their generally un-
derstood meaning, and may not resort to the implication
suggested by appellees and read into the act as unex-
pressed legislative intention to provide a remedy by view-
ers for injury such as petitioners complain of. We have
already referred to the obvious legislative purpose of
passing the four acts approved May 16, 1891, as stated in
Howell v. Morrisville Boro., supra.

In Keim v. City of Reading, 32 Pa. Superior Ct. 613, at
page 620, RICE, P. J., said: "Statutes are not presumed
to make any change in the rules and principles of the
common law beyond what is expressed in their provi-
sions, or fairly implied in them, in order to give them full
operation; rules of the common law are not to be changed
by doubtful implication: Endlich on Interpretation of
Statutes, section 127. Indeed, the rule has been more
broadly stated as follows: 'In all doubtful matters and
where the expression is in general terms, statutes are to
receive such construction as may be agreeable to the rules
of the common law in cases of that nature, for statutes
are not presumed to make any alteration in the common
law farther or otherwise than the act expressly declares;
therefore, in all general matters, the law presumed the
act did not intend to make any alteration, for if the leg-
islature had had that design they would have expressed
it in the act': Pettit v. Fretz's Exr., 33 Pa. 118. And the
view has been expressed that an intention on the part of
the legislature to alter the statute law is sometimes pre-
sumed upon much slighter grounds than would support

any such inference in the case of the common law: Wilberforce Stat. L. 21, cited in above section of Judge ENDLICH'S work." See also Merrick v. DuPoint, 285 Pa. 368, 132 A. 181; March v. Traction Co., 285 Pa. 413, 132 A. 355; Bridgeford v. Groh, 306 Pa. 566, 160 A. 451.

What has been said on this subject is sufficient answer to the inference proposed to be made from the Act of May 28, 1913, P. L. 368; "Section 1. Be it enacted, &c., That the right to damages against cities, counties, boroughs, or townships, within this Commonwealth, is hereby given to all owners or tenants of lands, property, or material abutting on, or through which pass, roads, streets, lanes, or alleys, injured by the laying out, opening, widening, vacating, extending or grading of said roads, streets, lanes or alleys, or the changing of grades or lines thereof, by said cities, counties, boroughs or townships"; the word "extending" (also used in the Act of 1891) as applied to a street, and in the context, does not include the construction of a tunnel under the street but refers to extending the length of the street.

In the courts below some reliance was placed on a suggested implication from the provisions of the Transit Act of 1913 (P. L. 520), but we must also reject this contention. There is no room for implication that a remedy by viewers was intended for work done within the street lines. The portion of the title (see Halderman's App., 104 Pa. 251, 259) dealing with boards of view refutes such a contention: "To exercise the right of eminent domain in connection therewith and prescribing the manner of ascertaining the damages sustained in connection with such exercise." The act enabled the city to construct and operate transit facilities which were defined "to include tunnels, [or] subways . . ." Sections 6 to 10 dealt with eminent domain. Section 6 provided: "It shall be lawful for, and the right is hereby conferred upon, cities of the first class of this Commonwealth to purchase, acquire, enter upon, take, appropriate, occupy, and use such lands, rights, and interests therein, prop-

erty and franchises, within their respective corporate limits, and within the corporate limits of adjacent cities, boroughs, and townships, as shall be necessary for the acquisition, location, construction, maintenance, use, and operation of transit facilities, or any one or more of them, under the rights conferred by this act, including such lands and rights, and interests therein, as shall be necessary for future additions to and enlargements of such transit facilities, or any one or more of them; also such lands and rights and interests therein as shall be necessary for the relocation of any track or tracks of existing railroads or railways, or of any pipes, sewers, subways, underground conduits, or ways, necessary to be removed and relocated in order not to interfere with the location, construction, maintenance, use, or operation of such transit facilities, or any one or more of them; and including, also, such lands and rights, and interests therein, as shall be necessary for the purpose of disposing of earth, stone, and other material excavated in the construction of such transit facilities, or any one or more of them: Provided, however . . ."

These provisions conferred no power that the city did not already possess to do anything necessary within the lines of the city streets; the obvious purpose was to empower the city to obtain such land outside the street lines or outside the city limits as might be required for the purposes of the construction and operation of the railway system: Cf. Phila. Elec. Co. v. Phila., 301 Pa. 291, 301 et seq., 152 A. 23. An illustration of the exercise of this power may be found in an ordinance passed April 11, 1924 (Ordinances, 1924, page 133), providing for the appropriation of property in the 42d Ward "required [as set forth in the title] to be taken in connection with the construction of a terminal yard and approaches to a subway in Broad Street." Without the power of condemnation, granted for that purpose, the city could not have provided such necessary facilities for operation. The

statute, however, conferred no remedy by viewers for anything done within the street lines.

Appellees also rely on the Act of June 23, 1911, P. L. 1123, establishing in each county a board of viewers from which viewers are selected for particular cases as required from time to time. The property owners in their brief select the word "altering" in section 5 (amended April 30, 1929, P. L. 866) of this act, and say it includes the construction of a tunnel or subway in a street. "The general purpose of the statute," we said in Reber's Petition, 235 Pa. 622, at 627, 84 A. 587, "was to create in each county a Board of Viewers from whose members a selection is to be made, to act as viewers and juries in particular cases." At 629: "The chief purpose of the statute was to provide a competent and efficient piece of machinery, which when once in operation could be made available by any authority having need for its services. Once established, the membership of the Board of Viewers is to be at the service of any Court or Judge who may find it necessary to appoint viewers." This statute did not pretend to furnish a remedy by viewers where none existed before. While the word "altering" appears in section 5, the meaning of the provision is that if, in a proper case, a petition for viewers is presented asking for viewers "for the purpose of viewing, laying out, opening, grading, altering, widening, vacating or constructing . . .," etc., the viewers shall be chosen from the board. No right to a remedy by viewers is given to parties who had none before.

The orders appealed from are reversed.