598 A.2d 1288

NORTHAMPTON COUNTY AREA COMMUNITY COLLEGE
and Northampton County Area Community College
Authority, Appellants,

v.

DOW CHEMICAL, U.S.A.; Masonry Systems of Pennsylvania,
Inc. a/k/a Gramar, Inc.; Wallace and Watson Associates,
Successor in Interest to Coston Wallace Watson; James T.
Hartnett Construction Co., Inc.; and Clarence B. Haney Ma-
son Contractor, Inc., Truett Coston, William Wallace and
William Watson, Individually and t/a Coston, Wallace and
Watson, Appellees.

Supreme Court of Pennsylvania.

Argued Jan. 18, 1991.

Decided Nov. 7, 1991.

Reargument Denied May 29, 1992.

Paul A. Logan, Richard B. Ashenfelter, Jr., Mark F.
Brancato, King of Prussia, for appellant.

Jonathan D. Herbst, Philadelphia, for Masonry Systems
of Penna. Inc., a/k/a Grammer, Inc.

John E. Schuppert, III, Mark A. Welge, Philadelphia, for
Dow Chemical, U.S.A.

Joseph A. Holko, Allentown, for Wallace and Watson
Associates, Successor in interest to Coston Wallace Watson.

Elizabeth McKenna, Philadelphia, for Truett Coston, Wil-
liam Wallace and William Watson, Individually and t/a
Coston, Wallace and Watson.

Shawn P. Kenny, Harrisburg, for James T. Hartnett
Const. Co., Inc., and Clarence B. Haney Mason Contractor,
Inc.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## ORDER

PER CURIAM:

Order affirmed.

PAPADAKOS, J., files a dissenting opinion in which LARSEN, J., joins.

PAPADAKOS, Justice, dissenting.

Because I believe this Court should have addressed the question of who can invoke the doctrine of *nullum tempus occurrit regi* (time does not run against the king), I feel compelled to dissent to the per curiam order disposing of this appeal.

On or about August 31, 1971, the Appellants, Northampton Area Community College[1] and the Northampton Area Community College Authority,[2] engaged James T. Hartnett Construction Company, Inc. (Hartnett), Appellee, to construct The Engineering and Business Technologies Center (the EBTC). Hartnett subcontracted with Appellee, Clarence B. Haney Mason Contractor, Inc. (Haney), who hired Masonry Systems of Pennsylvania, Inc. (MSI), Appellee, to construct the building's exterior—prefabricated, split-stone, masonry panels (panels). These panels were assembled with mortar and a bonding agent called "Sarabond" and fastened to the exterior of the building. Sarabond, a saran latex mortar additive, designed to create a superior bond when used in mortar, was sold by Appellee, Dow Chemical U.S.A. (Dow).

1. The Appellant, Northampton County Area Community College (College), was created pursuant to an enabling statute, the Community College Act of 1963, 24 P.S. § 5201, *et seq.*, which has since been repealed and replaced by 24 P.S. § 19–1901–A, *et seq.*

2. The Appellant, the Northampton Area Community College Authority (Authority), is a body created under another enabling act, the Municipality Authorities Act, 53 P.S. § 301, *et seq.*

On June 1, 1973, the architect issued a certificate of substantial completion. Approximately six years later, on January 12, 1979, Dow informed the Northampton County Area Community College Vice President for Administrative Services, Leon Reichwein, that the panels on the EBTC which were bonded with Sarabond, may cause corrosion to the panels if they were unprotected. Dow encouraged the Appellants to have the panels inspected by a qualified person and requested, if such an inspection took place, that it be present.

The Superintendent of Buildings and Grounds personally inspected the panels and discovered cracks in the mortar and rust stains on the panels. He reported his findings to the architect and the College's legal counsel who recommended that the Appellants immediately retain an independent party to inspect the panels. The Appellants contacted an architect to conduct an inspection, but the inspection never occurred. Finally, in May of 1980, the College contacted Dow and asked it to inspect the panels.

Dow agreed to inspect the panels and instructed the college to cut and to remove panel sections for testing. Fourteen months later, Dow issued its report and concluded that the cracks were not the result of Sarabond's adverse effect on unprotected steel. Instead, it concluded that the cracks were caused by freeze-thaw conditions. Nevertheless, the Appellants continued to detect new evidence of exterior cracking, as well as corrosion of the steel rods embedded within the panels. Consequently, the Appellants approached a Sarabond expert and requested him to review Dow's report. The expert reviewed the report and, contrary to Dow's opinion, concluded that the cracks in the panels and the corrosion of the steel rods were a direct result of the adverse effects of Sarabond.

On July 2, 1984, the Appellants filed a Praecipe for a Writ of Summons.[3] A Complaint was filed which alleged the

3. While the College filed the same allegations against the architects and the contractors, the appeal to the Superior Court only involved the counts brought against Dow. The other co-defendants filed a

following theories for recovery: 1) breach of express and implied warranties; 2) strict liability for damage under § 402A, Restatement of Torts (2d); 3) negligence, i.e., failure to warn of the possible damage which could occur from the use of Sarabond; and, 4) fraud, i.e., Dow knew Sarabond caused corrosion, but it concealed this knowledge when it submitted its inspection report. Dow moved for summary judgment and argued that the applicable statute of limitations barred the Appellants' tort claims. The trial court granted the Appellants' motion for additional discovery, and the Appellants claimed that they were Commonwealth agencies and, as such, any statute of limitations defense raised must fail under the doctrine of *nullum tempus occurrit regi* (*nullum tempus*).

After careful consideration, the trial court reasoned:

The relevant issue ... [was] whether the [Appellants were] associated with the Commonwealth in a way which permit[ted] the Commonwealth's immunity to extend.... [Because, when] the Commonwealth is acting in a sovereign capacity, rather than performing a proprietary function, it is immune from the statute of limitations.

(Trial court opinion, p. 4.) The trial court concluded that the Appellants were not a Commonwealth party and they could not invoke *nullum tempus*, since the contracting for, and the building of, the EBTC was more akin to a proprietary function than it was to a governmental function. Therefore, the trial court granted Dow's Motion for Summary Judgment because all of the applicable statutes of limitation had expired.

Appellants filed an appeal with the Commonwealth Court, but that court concluded that it did not have jurisdiction, since the Appellants were not a part of the Commonwealth government. However, the Commonwealth Court did not dismiss the action. It transferred the case to the Superior Court, because it considered the *nullum tempus* issue to be an issue of statewide importance affecting all litigants.

notice of appeal, which was subsequently withdrawn following the reinstatement of Dow as a third party defendant.

The Superior Court analogized *nullum tempus* to statutory sovereign immunity and concluded, since "the same class of party may invoke each," the courts of this Commonwealth, when deciding which parties may invoke *nullum tempus*, must look to the statutory definitions to decide if a plaintiff is a "Commonwealth party." *Northampton County Area Community College v. Dow Chemical, U.S.A.*, 389 Pa.Superior Ct. 11, 566 A.2d 591 (1989). In affirming the trial court, the Superior Court concluded:

> The legislature has clearly set forth the entities that comprise this class. Therefore, when the question is whether an entity is a Commonwealth party, a determination should and can be made solely with reference to the legislative intent as expressed in the statutes; no judicial test is required. That the rationales supporting the two doctrines differ has no bearing on the legislature's ultimate and exclusive power to grant or to waive each privilege. We conclude that to adopt the position that one doctrine may apply to a party while the other may not contravenes the plain intent of the legislature.

*Id.*

While the purpose of any statute of limitations is to expedite litigation and thus discourage delay and the presentation of stale claims, which may greatly prejudice the defense of such claims, *Insurance Company of North America v. Carnahan*, 446 Pa. 48, 284 A.2d 728 (1971), an exception to this principle exists where the Commonwealth is the party seeking to recover damages for an injury suffered. *Commonwealth, Department of Transportation v. J.W. Bishop & Co.*, 497 Pa. 58, 439 A.2d 101 (1981). As a matter of important public policy, statutes of limitation do not run against the Commonwealth. *Pennsylvania Turnpike Commission v. Atlantic Richfield Company*, 482 Pa. 615, 394 A.2d 491 (1978). When the Commonwealth invokes *nullum tempus*, it seeks to "vindicate public rights and to protect public property." *Commonwealth, Department of Transportation v. Rockland Construction Co.*, 498 Pa. 531, 448 A.2d 1047 (1982). Every time this court

applies the principle of *nullum tempus,* it announces that the Government, which holds its interest in trust for all people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes. *J.W. Bishop, supra;* See also, *United States v. State of California,* 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).

*Nullum tempus,* like the doctrine of sovereign immunity, has its roots in the prerogative of the Crown. *J.W. Bishop, supra.* Yet, despite their common origin, the doctrines have been consistently recognized as distinct. *Id.*

> Whenever the Commonwealth invokes the doctrine of *nullum tempus,* it is seeking as a plaintiff to vindicate public rights and protect public property. Thus, since its adoption in this country, the rationale for the doctrine of *nullum tempus* has been 'the great public policy of preserving public rights, revenues, and property from injury and loss.' Moreover, the benefits and advantages of the doctrine of *nullum tempus* extend to every citizen ... whose plea of ... limitations it precludes.

> On the other hand, when the Commonwealth appears as a defendant and invokes the defense of sovereign immunity, it seeks to deny those whom it has allegedly wronged the opportunity to obtain relief. Thus, sovereign immunity, "a carryover from the English doctrine that 'the King can do no wrong' ", ... has been defended on the theory that without it the courts would be overburdened and the Commonwealth financially imperiled. It has never been justified on the basis of the need to protect public rights.

*Id.,* 497 Pa. at 64–66, 439 A.2d at 104.

The distinction between the two doctrines became more apparent after this court abrogated common law sovereign immunity, and the legislature promulgated its form of statutory sovereign immunity. When we abrogated common law sovereign immunity in *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978), we did not see fit to abrogate the doctrine of *nullum tempus.* *J.W. Bishop, supra.* Accordingly, unless a statute of limi-

tations expressly so provides, the statute is not applicable to actions brought by the Commonwealth. *Commonwealth, Department of Transportation v. Rockland Construction Co., supra; J.W. Bishop, supra.*

I believe that the Superior Court has overlooked the fact that these two doctrines are separate and distinct and sovereign immunity is legislatively controlled; whereas, *nullum tempus* remains the creation of this court. Unless the legislature explicitly states in its statute that the common law has been abrogated, we must refer to our precedents when applying this doctrine. Statutes are not presumed to make any alteration of the common law further or otherwise than the act expressly declares. See, *Locust Street Subway Case,* 319 Pa. 161, 179 A. 741 (1935). Additionally, a change from the common law cannot be presumed; it must appear to have been meant, or it will be held not to have been made. *Central Lithograph Co. v. Eatmor Chocolate Co.,* 316 Pa. 300, 175 A. 697 (1934).

In the case *sub judice,* three different statutes of limitation come into play: 13 Pa.C.S. § 2725 [4] (Statute of limita-

4.   § 2725.   **Statute of limitations in contracts for sale**
(a) **General rule.**—An action for breach of contract for sale must be commenced within four years after the cause of action has accrued. By original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
(b) **Accrual of cause of action.**—A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.
(c) **New action after termination of another.**—Where an action commenced within the time limited by subsection (a) is so terminated as to leave available a remedy by another action for the same breach such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute.
(d) **Laws and actions unaffected by section.**—This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this title becomes effective.

tions in contracts for sales); of 42 Pa.C.S. § 5524[5] (Two year limitations); and 42 Pa.C.S. § 5527[6] (Six year limitation). Since none of these aforementioned sections contain express language which forbids the Commonwealth from instituting an "otherwise time barred action," these statutes do not expressly abrogate the Commonwealth's ability from invoking *nullum tempus.*

As set forth in my dissent in *Marshall v. Port Authority of Allegheny County,* 524 Pa. 1, 568 A.2d 931 (1990), I continue to believe that authorities created under the Municipal Authorities Act, 53 P.S. § 301, *et seq.,* even though they are ostensibly created by a municipality, are creatures of the state, and they must be regarded, therefore, as agencies of the Commonwealth. In *Marshall,* I referred to the case of *In re Municipal Authority of the Township of Upper St. Clair (Simon's Appeal),* 408 Pa. 464, 184 A.2d 695 (1962), where this court explained:

5. § 5524. Two Year limitation
The following actions and proceedings must be commenced within two years:
(1) An action for assault, battery, false imprisonment, false arrest, malicious prosecution or malicious abuse of process.
(2) An action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.
(3) An action for taking, detaining or injuring personal property, including actions for specific recovery thereof.
(4) An action for waste or trespass of real property.
(5) An action upon a statute for a civil penalty or forfeiture.
(6) An action against any officer of any government unit for the nonpayment of money or the nondelivery of property collected on execution or otherwise in his possession.
(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortuous conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.

6. § 5527. Six year limitation
Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from application of a period of limitation by section 5531 (relating to no limitation) must be commenced within six years.

The true nature of a Municipal Authority is that which is set forth in the earliest case of this court involving this type of public corporation. Section 2 of the Municipality Authority Act of 1945, 53 P.S. § 302(a)), defines the term "Authority" as meaning "A body politic and corporate, created pursuant to this act or pursuant to the 'Municipality Authorities Act of 1935' repealed hereby." It has been consistently held in cases in point, both under the Municipality Authorities Act of 1935 and 1945 and under other legislation involving authorities that an authority is not the creature, agent or representative of the municipality organizing it. In *Tranter v. Allegheny County Authority,* 316 Pa. 65, 79, 173 A. 289, 295 (1934), this court refers to the Authority "as the agent created for the purpose by the state" (emphasis supplied), notwithstanding the fact that under the Second Class County Authority Act the Authority therein provided for would not come into being until the county commissioners so declared. Much unnecessary confusion has been injected into this field in the past years, apparently on the erroneous impression that an Authority is merely the child or instrumentality of the municipality incorporating it, under the authority of such isolated and unfortunate expressions as set forth in *State College Borough Authority v. Pennsylvania Public Utility Commission,* 152 Pa.Super. 588, 594, 132 A.2d 909 (1957); and in the opinion of the Attorney General under the caption *In re Municipal Authorities,* 43 Pa.Dist & Co. R. 12, 16 (1941).

Moreover, constitutionally, such authorities must be state created, and they must be separate and distinct entities from the municipalities which compose them. This is to avoid violating Article 3, Section 31 of our Pennsylvania Constitution prohibiting the direct delegation of certain powers (such as the power to make and supervise municipal improvements, to levy taxes, or to perform municipal functions) to any special commission, private corporation or association. *Lighton v. Abington Township,* 336 Pa. 345, 9 A.2d 609 (1939).

*Marshall,* 524 Pa. at 15–17, 568 A.2d 931. Hence, I believe the Appellant, the Northampton County Area Community College Authority, is a Commonwealth party because the legislature authorized its creation and, therefore, is entitled to rely on the protections afforded by the *nullum tempus* doctrine.

We have held a statute of limitations will not run against the sovereign when it acts in a governmental capacity. See, *Commonwealth v. Musser Forests Inc.,* 394 Pa. 205, 146 A.2d 714 (1958).[7] In *Musser Forests,* we concluded that the statute of limitations on a trespass action was not applicable since the Commonwealth sought to recover appropriate damages for an injury suffered through a conspiracy to defraud it. *Id.* The defendants had breached a series of contracts, entered into with the Department of Forests and Waters for the purchase, from the Commonwealth, of large quantities of seedlings or transplant trees at a cost authorized by the Forest Tree Seedling Act. Under the contracts, the defendants covenanted to conserve the trees purchased by them solely for possible future wood products or watershed protection. In its case, the Commonwealth alleged certain well defined overt acts in furtherance of this conspiracy, viz., the defendants' sale of the trees commercially, for ornamental purposes. As a direct result of the defendants' conduct, we agreed with the Commonwealth that it did not receive the benefits for which it had bargained—improved watershed, better soil conditions, better crop protection, and a more abundant future supply of timber for wood products. *Id.*

On the other hand, we have limited the effect of *nullum tempus* where we found the sovereign to be operating in a proprietary capacity, *City of Philadelphia v. Holmes Electric Protective Co.,* 335 Pa. 273, 6 A.2d 884 (1939). In *Holmes Electric,* the City of Philadelphia commenced an action in assumpsit to recover payment due under an ordi-

7. The Supreme Court of the United States has held that public policy protects the people from a loss caused by the dilatory conduct of its officials. See, *United States v. Nashville Chattanooga & St. L. Railway,* 118 U.S. 120, 6 S.Ct. 1006, 30 L.Ed. 81 (1886).

nance granting the defendant permission to carry electrical wires under city streets. The contract called for the defendant to pay a percentage of its gross receipts from all of the business it conducted within the city. The city claimed the defendant omitted certain items from its gross receipts from March 1, 1918, to March 1, 1937, while the defendant claimed a six year statute of limitations barred this claim. The trial court agreed, and we affirmed.

> The immunity of the sovereign from subjection to statutes of limitations does not, in the absence of express provisions to the contrary, extend to municipalities, counties, townships or boroughs.... It is true that, unless otherwise provided, statutes of limitations cannot be pleaded against such political subdivisions when they are seeking to enforce strictly public rights, that is, when the cause of action accrues to them in their governmental capacity and the suit is brought to enforce an obligation imposed by law as distinguished from one arising out of an agreement voluntarily entered into by the defendant. Plaintiff earnestly contends that the present case is one of that nature, that the ordinance involves an exercise of municipal control over the highways, that it grants a franchise and is legislative, not contractual, in character. But the consideration exacted in the ordinance is neither a tax or a license fee; it is in the nature of an annual rental to be paid for the privilege of the use of space under the streets....
>
> Since, ... the City of Philadelphia is here suing, not to compel the performance of a duty imposed by law, nor to assert a governmental power inherent in it as a municipal corporation, but to enforce a contractual obligation assumed by the defendant when it accepted the privilege granted by the ordinance, the statute of limitations is applicable to the suit. (citations omitted)

*Holmes Electric, supra.*

Thus, in my view, if Appellants are performing a governmental function in building the EBTC, they should be per-

mitted to maintain their suit against Dow in spite of the statute of limitations.

In determining whether Appellant, the Northampton County Area Community College, is "part of the Commonwealth," Appellees argue that community colleges are created by a *local* sponsor and not by the Commonwealth, which merely authorizes their creation by the local sponsor. Contrary to the Appellees' belief, I maintain that community colleges are created by the Commonwealth, every aspect of their existence is controlled or affected by the Commonwealth and, therefore, it is sophistry to claim that they are local agencies.

First, and foremost, the Constitution directs, "[t]he General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Article 3, Section 14. I believe the legislature has created the community college system with this constitutional mandate in mind because a college education is an important and integral step in the growth and maturation of the citizens of this Commonwealth. Once considered a luxury, a college education is now a necessity. Recognizing the need, I believe the legislature has responded by providing a community college system to give to all citizens of this Commonwealth the opportunity to obtain post-secondary education as part of the public education of our citizens.

Second, Article XIX-A, Community Colleges,[8] sets forth explicit guidelines for the establishment and operation of a community college. 24 P.S. § 19–1901–A, et seq. These guidelines enable a community college to fulfill the needs of the respective community. Without the action and involvement of the legislature, the community college system would not exist. Before a school district, a municipality, or a county board of school directors, can establish a community college, it must submit:

8. Article XIX–A, Community Colleges, was added by Act 1985, July 1, P.L. 103 No. 31, § 1, 24 P.S. § 19–1901–A.

A plan prepared in accordance with the policies, standards, rules and regulations of the State Board of Education for the establishment or operation of a community college and shall include a survey of any industrial development and manpower needs of the area and of any vocational and occupational shortage and the means by which the community college program and curriculum shall further industrial development, reduce unemployment and improve employable skills of the residents of the area served by the community college.

24 P.S. § 19–1901–A(5). See also, 24 P.S. § 26–2603–B.[9]

Once approved, the community college remains under the control of the State Board of Education. The State Board of Education is empowered:

(1) To adopt such policies, standards, rules and regulations ... as may be necessary to provide for the establishment, operation and maintenance of community colleges, including minimum requirements for physical facilities and equipment....

24 P.S. § 19–1902–A(a)(1) and (2). In addition, it prescribes the types of diplomas, certificates or degrees granted to those students who complete post-secondary education courses in a community college. 24 P.S. § 19–1912–A. And finally, no school district, or municipality, which is a local sponsor or part of a local sponsor, may withdraw its sponsorship from a community college, nor may any community college be disestablished, without the approval of the State Board of Education. 24 P.S. § 19–1910–A.

Lastly, the legislature has implemented a financial support system for community colleges. The governing body of each school district or municipality compromising a local sponsor may levy, annually, taxes on subjects of taxation as

**9.** 24 P.S. § 26–2603–B provides:

The [State Board of Education] shall have the power, and its duty shall be, to review the statements of policy, standards, rules and regulations formulated by the Council of Basic Education and the Council of Higher Education, and adopt broad policies and principles, and establish standards governing the educational program of the Commonwealth.

prescribed by law in such school district or municipality for the purpose of establishing, operating and maintaining the college 24 P.S. § 19–1909–A. See also, 24 P.S. § 19–1913–A.[10] In addition, it is directed that:

> (4) ... The Commonwealth shall pay to a community college on behalf of the sponsor on account of its capital expenses an amount equal to one-half of such college's annual capital expense from funds appropriated for that purpose to the extent that said capital expenses have been approved as herein provided.

> . . . . .

> (c) *Capital expenses shall mean only such expenses as are incurred with the approval of the Department of Education for amortization of the purchase of lands; purchase, construction or improvement of buildings for administrative and instructional purposes....* (emphasis added)

24 P.S. § 19–1913–A(b)(4), (c).

Clearly, since the Commonwealth is so intricately involved in the creation of the college and in paying for this building, I believe the college furthered its governmental function when it contracted for the erection of the EBTC. Without

---

10. 24 P.S. § 19–1913–A provides for the following financial support to community colleges:

> (b)(1) The Commonwealth shall pay to a community college on behalf of the sponsor on account of its operating costs during the fiscal year from funds appropriated for that purpose an amount equal to one-third of such college's approved operating costs not to exceed three thousand dollars ($3,000) per student multiplied by the number of equivalent full-time students determined by an audit to be made in a manner prescribed by the State Board of Education. (2) ... the Commonwealth shall pay to a community college, on account of its operating costs for all equivalent full-time students enrolled in the following categories of two-year or less than two-year occupational or technical programs, a stipend as follows:
>
> (i) One thousand one hundred dollars ($1,100) per full-time equivalent student enrolled in advance technology programs....
>
> (ii) One thousand dollars ($1,000) per full-time student enrolled in programs designated as Statewide programs....

516

the influx of capital from the Commonwealth, construction of the EBTC would not have been possible. Therefore, any loss sustained by the Appellants will ultimately fall upon the Commonwealth and, then, upon its citizens, the taxpayers.

For all these reasons, I would reverse the order of the Superior Court and permit Appellants to benefit from the doctrine of *nullum tempus occurrit regi* in the maintenance of their suit against Dow.

LARSEN, J., joins this dissenting opinion.

(iii) Five hundred dollars ($500) for full-time student enrolled in other occupational or technical programs.